May it please this honorable court, I wanted to say thank you in the beginning for allowing me to consolidate and have these oral arguments together on the same day for both Kraxberger and Paulos. I think it will be more efficient for the court and certainly for me. I wrote a very large check on April 15th, and I'm sure I'm not alone in this room. Get a tax advisor, Mr. Witt. Pardon? Get a tax advisor. Go ahead. Your Honor, I think the way it works is the government has a 40% contingent fee contract with me, so I don't think there's much I can do to get around that. This case is a little different from the case that follows in that I suspect the closest analogy to this case may have occurred in October of 1985 when a certain umpire by the name of Don Dinkinger blew a call in Kansas City. This is a case essentially where the judge just made a couple of errors that I think are fairly important, and I want to be of assistance to the court. I know the court's read the briefs and understands the factual situation. I have some prepared comments, but obviously I'm more than happy to address whatever questions the court has, too. The first issue that we briefed was the procedural rule with regard to whether or not this is an affirmative defense or a jurisdictional bar, and how this court applies the Supreme Court precedent in that regard is important. In Landgraf and several of the other cases, the issue was whether a jurisdictional change applied at the time that that statute took effect or whether it applied to conduct prior to it. And certainly much of the conduct at issue here occurred prior to the changes in the statute in 2010. But the statute was implemented, and it effectively changed what was a jurisdictional bar because the statute read no court shall have jurisdiction and changed it over to a non-jurisdictional bar that said the court shall dismiss unless opposed by the government, and then it listed the requirements of the public disclosure bar. The reason I think that's important is because with a procedural rule like that, unlike other False Claims Act cases, the one where, for example, they tried to use the change in the law in 1986 to grandfather in conduct that occurred before 1986, that's a clearly different scenario because essentially it created jurisdiction that went backward. I don't think you can do that. That was clearly a retroactivity issue. Yeah, but you're talking about Hughes Aircraft, right? Yes, sir. Well, doesn't Hughes Aircraft, isn't it pretty much directly on point because it says if it affects a substantive change and Congress doesn't make it retroactive, then it's not retroactive? Well, the reason I think it's not precisely on point is because the 86 amendments essentially created jurisdiction for issues that had fallen outside the jurisdiction of the act prior to those 1986 amendments. In this situation, the only thing that's changed is the jurisdictional bar, and it barred jurisdiction previously, and now they removed that jurisdictional bar. So I think it actually falls closer to Landgraf, and Hammond v. Rumsfeld I think is a case that you should look at because I believe that what they did there was they essentially recognized that you're not altering a right. The case was certainly defensible under public disclosure after the 2010 change. It just changed it from an absolute jurisdictional bar over to a bar that you have to engage in some factual inquiry in. Well, counsel, they use the word dismiss. We usually don't engage in factual issues before we dismiss. Well, certainly when you make a jurisdictional inquiry, you have to look at the facts with regard to jurisdiction. So you don't normally get to the facts of the case. I would agree with that, but you do get to the facts of jurisdiction. So therefore, on a dismissal under the new law, a dismissal can be before you look at any facts except those that are relevant to the dismissal. I think that's true. However, if there's a difference between a jurisdictional dismissal, at least as I've always understood it, and a dismissal on the basis of failure to plead and prove the requisite facts to support the case, it seems to me that if this is an affirmative defense, which is certainly what the Fifth Circuit seems to think it is, and I would encourage the court to look at those cases, if it's an affirmative defense, they have a burden to plead and prove that affirmative defense. And certainly if this case is dispensable on public disclosure grounds, they can renew that claim on summary judgment, and they may stand a chance of winning on that basis after the facts are fully developed. You may have drawn a distinction there. I'm just looking at this practically. I'm wondering what practically difference it makes to switch from jurisdiction to a dismissal, non-jurisdictional dismissal. You've described one of them, maybe that some of these things that could be raised jurisdictionally are now an affirmative defense. But what other practical difference is there? Your Honor, that's a good question. You know, it's hard to, outside the facts of this case, hypothecate about what might be in another matter. But in this particular case, the issue of public disclosure and original source are fact dependent, and they are tied together in that manner in that if the court finds that there is a public disclosure, then it must apply the original source exception if the original source exception fits. And it seems to me that as a practical matter, wouldn't it be better to have all of the facts sworn, depositions, everything in the record before you made that determination, as opposed to doing it at the outset on the basis of affidavits and the pleadings? I think it would be, and I think that's the reason why Congress changed the statute, frankly. That and the fact that since 1986, the whole procedural issue of based upon and public disclosure has given every circuit court of appeals and the Supreme Court nothing but fits. It's one of those situations where the language certainly appears clear when it's written in the statute, but it's been very, very difficult for every one of the courts of appeals, and certainly the district courts, to apply that standard. So by changing it over from a jurisdictional bar where you don't even get your foot in the courthouse door, over to a situation where you have to plead and prove it as an affirmative defense, it improves the fact-finding and it improves the access certainly for Relators Council and for Relators to the courts to be heard. That's what I think that particular issue is. But if I may, I'd like to move to my next issue. Well, maybe you're going to that. But I think in this case, one of the things that I have a real question on is the Rule 90 fraud, sufficiency of the fraud allegations. And in light of our, I don't know how you pronounce it, Joshi, which is the case I wrote, Joshi v. St. Luke's Hospital, and then Roop v. HypoGuard, I think. How does this differ from those cases in that you have alleged enough of the who, what, when, where, how, and so forth to meet the Rule 90 requirements? Well, Your Honor, we've certainly alleged all of the facts necessary under Rule 90. The district court made that determination. I assume now you're asking about the cross appeal. Right. And that cross appeal only comes, I mean, I assume if you're saying that that's an additional ground upon which to affirm the case. We pleaded and we included information about individual claims where those individuals had either Medicare or TRICARE or U.S. military, and they had these pumps implanted. But as I see it, you didn't. Are you talking about your list of 77? Yes, Your Honor. But I didn't see that that tied to any particular doctor or even that they had a particular procedure. Somehow they were, there was a connection to your allegations here. Well, Your Honor, that goes back to the other case that I discussed in my brief, Levesky, about what level of generality you want to use to look at Rule 9b. I think, does it materially assist the government when it's investigating one of these cases to have patient names? Certainly it does. I don't, does Rule 9b require encyclopedic pleading about whatever procedure the patient had? We have to follow our precedent. I mean, how would you distinguish this case from Joshi or Roop? This is a common scheme or plan case in that the common scheme and plan was that you didn't disclose. I think Joshi was, too. Pardon me? As I recall, Joshi was, too, or maybe it was Roop, one or the other. Well, in Joshi, Your Honor, you wrote a very good opinion in that basically Joshi came in and said everything's bad. They, you know, every case was fraudulent because they didn't have these, I think it was an anesthesia case. They didn't have, you know, he couldn't lay out which individual patients. He didn't have a list of patients where this had been done. He just said that everything that had been done was wrong. Here we have patients that we've identified who had these procedures done and who suffered damages as a result of it or complications. And one of the things this Court should be sensitive to is the fact that we're spending more and more and more of our GNP on health care, and if we are constantly going to allow people to put products out that are defective and do it in violation of federal regulations, you know, we're going to have more of these kinds of issues. It's just going to be a problem. But if I could back up a moment and go to the issue of the original source, one of the problems that I have in this case is that, and this is sort of the Don Dinkinser moment, you know, the Court says that essentially that Dr. Palos waited for the studies. He actually performed those studies. He was one of the first people, along with Dr. Beck, who determined that there was a problem with these pumps, and he took that information to the defendants in this case, at least with regard to Sienter and certainly with regard to the causal connection between the pumps and the joint damage. Dr. Palos is an original source, and I don't know, you know, there were a lot of pages of documents that were in those motions. Defense counsel did an excellent job of bringing this motion at the beginning of the case and laying out their factual predicate. There were a lot of documents. Maybe the Court thinks it saw that, but that's simply not in the record. Dr. Palos was an original source with regard to the patients. His knowledge was acquired in the operating room. He didn't read about this by reading a brief or a newspaper article. He saw these patients. He treated them. He's an original source. So even if there is a public disclosure, he should be able to bring this case because it's an original source. He's an original source. And the other error, because it's pleaded, both of these facts are pleaded in the complaint, and I don't believe they're ever really controverted by the defendants. Nothing shows he did not disclose this to the Federal Government, and, in fact, we pleaded that he did. We served a disclosure on the Federal Government before we filed this case, and, of course, we filed an evidentiary disclosure after we filed the case, and Dr. Palos met with him. Counsel, I'm a paragraph behind you. Now, I think the district court's not too accurate about saying that he never learned of it until he read the published studies, but also your client admits that he first heard about all this and put the dots together when Dr. Beck wrote about this and Dr. Beck said it. So isn't Dr. Beck the original source and not Dr. Palos? Dr. Beck brought a concern to him, and with that concern, they sat down and worked through it together, and they started looking at cases. Dr. Palos did not believe that there was a problem, and he didn't believe that the pumps were causing an issue because he had had pumps placed, or he had basically not put any of these pumps in place because he didn't really think they were that helpful, but he knew that one of them had been placed on one of his patients, and when he looked back, he saw that that patient had this PAGCL problem. And so that was a wake-up call for him, and he went back to Dr. Beck, and he said, yes, let's investigate this, and he worked with Dr. Beck. So, you know, it doesn't say he has to be the original source. It says he has to be an original source. And, Your Honor, I'm going to have to reserve some time for rebuttal, I know, but I think that's really the heart of this case. The heart of this case is the original source question. I think the court just dropped the ball on that one, and certainly we pleaded that he was an original source, and we pleaded that he had this direct and independent knowledge. And if you don't get that knowledge by treating these patients, and remember, in addition to working with Dr. Beck, he helped repair a number of patients who had this PAGCL in their shoulder. He actually did the surgeries that corrected those to the extent they could be corrected. So I know that I need to stop and let my opponents go forward, but that's what I believe the heart of the case is. And, again, thank you for your attention. Thank you, Mr. DeWitt. Good morning. Is Mr. Levi or Levy? Levy, Your Honor, but either one is fine. Good morning. Often mispronounced name. Good morning, Your Honor. May it please the Court. Joshua Levy on behalf of Stryker Corporation. I want to address some of the questions that the Court raised with Mr. DeWitt, but if I may just step back and provide a little bit of context. I think the timeline is important for this Court to understand. This key TAM complaint was filed in January of 2011. That is years after the first media reports about the problems with these pain pumps, and particularly in the insertion in the joint space, years after public complaints have been filed and even judicial decisions. So this is not a case of a person who is bringing something, coming forward to the government. It's really someone who is coming in at the end. And the first question that, Judge Benton, I believe you went to, very important, is which version of the False Claims Act should apply in this case? Should it be the one that was in place before the Patient Protection Affordable Care Act, PAPACA, or the one after? And I think the case law is clear. If a statute, A, doesn't contain an express statement of retroactivity, which I think we all agree the 2010 False Claims Act Amendment do not, and, B, affects the substantial rights of the defendant, then you do not apply that to pending cases. You do not apply that retroactively. The Supreme Court said that in Graham County. And the only possible distinction that Mr. DeWitt raised in his brief is that this case was filed after the amendments took effect, so it wasn't a pending case. That exact issue is what the Court addressed in Hughes Aircraft. In Hughes Aircraft, the case, the key TAM complaint there was filed after the 1986 amendments, and the Supreme Court said no, you look at the time of the conduct to decide whether a statute should be applied retroactively. So I think the case law is clear that the pre-March 2010 version of the False Claims Act should apply to this case. And if I may, Judge Riley, you asked what's the practical difference between the two. You do have this issue about jurisdictional or not jurisdictional, but in reality what happened here is Dr. Paulos and his counsel had every incentive to put in this record everything they knew about the misconduct they alleged at Stryker and the other companies. Why? Because they didn't know filing this with a pre-PAPACA version, which is clearly jurisdictional, would apply or with a post-PAPACA version. So the record is fully developed. And if you went down the path that Mr. DeWitt proposed, which is having discovery, you would really undermine one of the key policy objectives with the public disclosure bar. A, the Congress wants people to come forward and give the government notice about fraud against the government, but B, the government wants to avoid parasitic lawsuits that do nothing but recycle allegations already in the public disclosures and cut into the government's share. And if you allowed discovery the way Mr. DeWitt proposed, you would be essentially tying up the courts with parasitic lawsuits and people trying to establish that they qualify as a relator. I want to also address, Judge Rowley, your question about 9B. I think it's not only the Joshi case. It's several other cases from this district, even this year, and in January 2014 with the Dunn case. This court has clearly stated, as have many others, that in order to proceed with a False Claims Act case, you need to provide some representative examples of the false claims. You need to provide the details of who, the what, the when, the where. And this complaint clearly fails to do that. It does not provide the details of the supposed fraudulent promotion. It does not provide details of who said it, when they said it, who was present. And on the claims, Your Honor correctly notes, they are a list of 77 patients. They're not connected to any doctor that Stryker supposedly caused to submit a false claim. They're not even patients who are alleged to have suffered injury, if you look at the manner in which they're pled. And they're also not clearly stated in the allegations that the pain pump was placed in the joint space, which is the key issue in this case. I think the complaint is deficient on 9B. Going a little out of order, because I was taking the order, the questions came from the bench. If I can go back to the original source issue, because as this court well knows, there's a three-part test for deciding whether a public disclosure bar suffices. And the first one is whether the essential allegations of fraud were sufficient to put the government on notice that the government might have been defrauded. And I think the record that's down below of all the public disclosures, whether they're court complaints, court opinions, media reports, they clearly match up with the essential allegations in Dr. Paulos' complaint. And then you turn to the key question in this case is, does this relator have, does he qualify as an original source? Does he have direct and independent knowledge of the fraud alleged? And that's the key question. Does he have direct and independent knowledge of what? Of the conduct that would give rise to a false claims act suit. And in the briefing below, the focus has been, does Dr. Paulos have direct and independent knowledge of the fraudulent promotion that he alleges in his complaint? And I think the Newell case that this court decided fairly recently is very instructive on what the test is. The Newell case stands for the proposition that to be an original source, you need to have direct and independent knowledge of the true state of facts. Direct has been defined in this court to be seen with your own eyes. I think that's in the Kinney case, or unmediated by others' labor. And in this case, Dr. Paulos, by his own admission, does not know the true state of facts. The allegation in the complaint is that Stryker applied to the FDA to get clearance for use in the joint space. And that the FDA said, no, we're not going to clear your device for that use. And then Dr. Paulos, by his own admission, learned that in the course of the litigation. Those are the true state of facts. In the Newell case, which is a False Claims Act matter against the city of St. Paul, the true state of facts were that the city was not in compliance with the HUD requirements for providing. Counsel, do you agree with your opponent, though, that the district court seems to be wrong when it says Paulos didn't learn of the cartilage damage until he read the published studies? That's just wrong. Your Honor, I think that that's probably a simplistic characterization of the record. I think it is wrong. I'm quoting the district court. No, no. I'm sorry. I thought the trial court below, that statement was too broad brush. I don't think it's a fair statement. But in response to Mr. DeWitt, does Dr. Paulos have true knowledge that patients were being harmed by this device? Well, let's first ask what's the legal relevance of that. The False Claims Act, as this court well knows, is not a product liability statute. It's a statute about the submission of false or fraudulent claims to the federal government. So direct knowledge that a device may harm a patient does not qualify as direct knowledge of fraud against the government. I would also submit, though, that even by it's in the record, and Mr. DeWitt stated it up here to the court, Dr. Paulos claims to have one patient who suffered a degenerative condition in his shoulder from use of pain pump. And that, I would submit, is not direct knowledge that this pain pump causes damage in every patient. It's Dr. Beck who comes to him and says, I have multiple patients. It's Dr. Beck who authors a paper about this condition. By the way, he had a co-author, Dr. Hansen. Dr. Paulos wasn't a co-author on the paper. Even according to the record, he edited the paper and he helped arrange for its publication. But you agree there could be more than one original source, right? There certainly could be a case where there's more than one original source. If more than one, you may have first-of-file issues in that case. But there could be more than one original source if there are multiple individuals who know the true state of facts. And I would submit to the court the true state of facts here have to be the facts that give rise to the falsity of the subsequent representations. That's what the court said in the Newell case about the city of St. Paul. That's what the standard was in the nurse anesthetist case in the Eighth Circuit as well. So, Your Honors, I believe under the original source doctrine, Dr. Paulos does not qualify. And even if the standard is whether he was aware that the patients were harmed, he's also not an original source of that either. And whether you apply the post-PAPACA standard or the pre-PAPACA standard, I think the court should reach the same result that this defendant does not qualify and doesn't satisfy the public disclosure bar. Unless the court has other questions on the public disclosure, I will briefly touch upon the fact that we do have a cross-appeal. One of the elements, Your Honor, one of the, I should say, grounds for the cross-appeal is the 9B, which I've touched upon. We also submit that the district court's 12B opinion was inaccurate. And that this would provide an independent grounds for this court to reverse, excuse me, to affirm the dismissal of this complaint. And in particular, the allegations of unknowing causation do not rise to the level of being sufficient under Rule 12B. This pain pump, and whether it's approved for the intra-articular use, is still an unsettled question. The Sixth Circuit, in the Rodriguez case, ruled that the indications for use covered the joint space. So the standard on the false claim that you knowingly cause, you acquiescenter, to cause an individual to submit a false claim. Well, even if it's true that the allegations that Stryker supposedly told doctors to use the device in the pain pump in the shoulder joint space, that is still unclear whether that's an off-label use or not. And so we would submit that the Sienter allegation has not been satisfied under 12B. We also submitted arguments on materiality as well. And we'd stand on the briefings on those, Your Honor. Thank you very much. Thank you. Morning, Mr. Trella. May it please the Court, I'm here on behalf of the defendant, Iflo. I don't want to repeat things that Mr. Levy just said, and I agree with I think virtually everything he said on the retroactive effect of the statute. The only thing I would add there is that Dr. Paulos himself, in his briefs, said that the 2010 amendment changed the scope of the public disclosure bar and changed the scope of the original source exception. So that standing alone shows that this was a substantive amendment, not just a purely jurisdictional procedural one, and cannot be applied retroactively. As Mr. DeWitt said and Mr. Levy emphasized, the original source is really the heart of the case. There's no serious dispute, I think, that all of the essential elements of the fraud, the true state of facts and the alleged misrepresentations, had been made public in lawsuits and media reports, FDA releases, SEC filings, and that sort of thing. Now, to be an original source, you have to have direct and independent knowledge. Direct knowledge is what you saw with your own eyes. It is not, as this Court held in Barth and other cases, things you learned from somebody else secondhand or even the results of collateral research and investigations. And what I'd like to do is jump right to your question, Judge Benton, about the district court's comment that Dr. Paulos didn't learn about the connection until he saw it in published sources. I think that sentence, standing alone, is too broad brush, as Mr. Levy said. But that was at appendix page 205. If you continue reading and go on to 206, I think the district court explains more what he really meant when he talks about Dr. Paulos was reacting to inquiries and studies by other doctors. That's really the point, and if you look at even what Dr. Paulos has said himself, both in the district court and in this court, it's pretty clear that Dr. Beck was the original source and that Dr. He was an original source? Dr. He said the original source? That's a fair point, Your Honor, and you're quite right. There can be more than one original source, but in this case we don't have that because Dr. Paulos learned he got from Dr. Beck. It's not like he had a separate tract for this knowledge. According to the complaint, and this is paragraph 88, the amended complaint, Dr. Beck came to Dr. Paulos in 2004, and it was after that in 2005, according to his declaration, that Dr. Paulos became convinced about the connection. The opening brief says that it was Dr. Beck, and this is at page 28, who had been the first to report this discovery to Dr. Paulos. The declaration says that he, meaning Dr. Beck, raised with me the possibility of this relationship, and then after that Dr. Paulos went back to Dr. Beck and said, you know, I think you're right. And then when he talks about the articles that Dr. Beck's research, Dr. Paulos' role was encouraging Dr. Beck to write the article, promoting it, helping get it published. That's all fine, but that's the work of, you know, that's like the work of a literary agent or an editor. It's not the work of an author, and that's what you're talking about here. Let me direct you to a big-picture issue. What do you think the real pleading standard is in this case? I'm not sure I understand your question, Your Honor. Well, you know, if you try to put together either the pre-affordable care or the after-affordable care version of the statute, it seems to me it's some odd combination of a plausible claim with some cyanar and enough facts to overcome the public disclosure bar. Do you think that's what a relator has to plead here? Want me to say those three again? A plausible claim. Right. Cyanar alleged some way and enough facts to overcome the public disclosure bar. What do you think about that? I think that that is ñ I think in the ñ certainly the prepapaca statute, I think that's right. I think there may be an argument post-papaca whether the last of those is a requirement of the pleading or whether it's something that is raised on a motion to dismiss after the pleading is filed. But I think that's generally right, Your Honor. And, of course, all of that's with the overlay of ñ and they're separate requirements, but there's also the overlay of Rule 9b, of course, which applies to the False Claims Act because it's basically a fraud claim. And what you have here, I think, is ñ Well, I was trying to get around 9b, 12b, and all the alphabet soup of stuff going on. What a relator really has to plead? Right. Well, I think a relator has to plead, and, you know, I think this court has held it in the Minnesota anesthesis ñ nurse anesthesis cases, among others. He has to plead the ñ what the misrepresentation was and a connection to somehow that produces the false claims and some indication that this was not already publicly disclosed. And as I said, certainly in the pre-PAPACA world, I think that's a pleading requirement. And in this case, where Dr. Palos runs afoul of the pleading standard is obviously in the public disclosure area. There's no dispute that all of the key allegations of the complaint had been publicly disclosed. So then, again, as I said a moment ago, you get down to original source. As to IFLO in particular, Dr. Palos has a real problem with original source. In paragraph 12 of his amended complaint, he explains that he got much of his knowledge from his work as a consultant for Stryker and Breg. He makes clear a couple of paragraphs later that he never had that kind of a relationship with IFLO. He doesn't have any contention that he had any source of inside information or any non-public information about IFLO. He does not claim that he personally was ñ that IFLO personally sold to him, personally made any representations to him about FDA approval or the safety of the device or anything like that. In fact, if you look at ñ there's a complaint that we've reproduced in the defendant's appendix. It's the Rowlett complaint. I don't have the page number handy, but it starts ñ it actually starts at the end of Volume 1 and carries over to Volume 2 of the defendant's appendix. Paragraph after paragraph from that complaint are verbatim virtually in Dr. Palos' complaint. So we see the source of his knowledge concerning IFLO. It came from ñ it's not direct and independent knowledge at all. He doesn't even claim that he ever used an IFLO device in a joint. He doesn't claim any direct knowledge of IFLO's dealings with the FDA or the FDA approval status of any IFLO devices. As Mr. Levy mentioned, he even ñ Dr. Palos in his brief at page 48 points out that he actually learned that working as an expert witness in connection with product liability litigation. Again, clearly not direct and independent knowledge. So the ñ and another thing I would note for the court, if you look at his original complaint, he's got a section about IFLO, and then at appendix ñ his appendix, pages 61 to 64, he lists a whole bunch of documents that are the source of his knowledge for that ñ for those allegations. It's all discovery materials from these product liability and other lawsuits against IFLO. You go to the amended complaint after we filed the motion to dismiss on public disclosure grounds, and the ñ all the allegations are the same, but the supporting documents have been deleted from the amended complaint, because obviously he recognized the problem that identifying those sources created for him as an original source matter. So the bottom line, I think, with respect to IFLO, is that Dr. Palos does not have direct and independent knowledge of either the true state of facts or the alleged misrepresentations by IFLO. As I said, he does not claim that he was the recipient of any IFLO sales pitches. He alludes generally in paragraph 124, I think it is, of his complaint. He says he saw presentations to nurses and clinic employees, but that's all he says. He doesn't say there was ñ anything was said about FDA approval, anything was said about safety, anything was said about using it in the joint. It's just this bald allegation with nothing more. That is not direct and independent knowledge of anything relevant to his claims. If ñ I still have time, but I don't want to burden the court. If the court has no questions, I will sit down. Thank you. Okay. Thank you, Mr. Palos. I appreciate it. Mr. DeWitt, you have about five minutes left. Yes, Your Honor. There's a big difference between a Dodge and a Ford and a Chevy, but they're all cars. And with respect to what my opposing counsel was just saying, although I do believe that the pleading could certainly have been more artful with regard to IFLO and the allegations with regard to what he knew about IFLO, he had seen these pumps in action and he'd seen what happens to patients. There's a quotation that's in the briefing about all knowledge is inferential. When he worked ñ when Dr. Palos worked with Dr. Beck trying to put this together as a study ñ and I don't know what level of expertise the court might have with regard to medical studies. I was a registered respiratory therapist and I've worked on them. You work together as a group and information is shared. Essentially what the defendants want, and I think this would be terrible policy, they want an original source and public disclosure bar that essentially means that if you are not a co-conspirator, you don't qualify. If you weren't in on the decision to defraud the government and help apply that decision, then you're not an original source. I think from a public policy point of view, that's a really bad idea. In this situation, Dr. Palos had patients that he made the repairs on, that he actually did the joint surgery on. I don't think that's in the record. It should have been. When we put this together to put the briefing in front of the district court, we believed we had pleaded all of the elements necessary to establish original source. We put the affidavit in for the purpose of buttressing that. It could have been a lot longer. Our pleadings could have been a lot longer. And, yes, they could have been more detailed. But the key element as far as I'm concerned with regard to the fraud is they weren't, doctors were not told these were not approved for use in the joint space. They were marketed as being approved in the joint space, and that is the common element to all of these cases. All 77 of those people who were enlisted, that is a common element with regard to each one of those. I do believe it could have been more artfully pleaded. You know, in hindsight, there are a lot of things you would do differently in a case like this. Do you believe your complaint against either of the defendants here has alleged some representative examples of, you know, situations to support your claim? I believe certainly with respect to Stryker. I think it's less so with regard to IFLO. And I think some of the gentleman's criticisms are accurate. With regard to Stryker, what are the representative examples you have? Well, first of all, Dr. Pallas worked with Stryker. He was initially a consultant with them. And one of the things he told them is, you know, if you guys decide to do these pain pumps, you need to test them. You need to do animal studies first so that you can get FDA approval for them. And then he went off to do other things, and they went about the process of making these pumps. When this PAGCL started to show up, he went back to these Stryker reps that he worked with because he has actually done and designed a number of products that Stryker continues to sell. And he went to them, and he said, you know, these things are hurting people. You need to fix this. That certainly has not ever been publicly disclosed, but certainly with respect to that, he's an original source. Certainly with respect to the patients that he repaired, that is an original source. I don't believe we've pleaded that any of those patients were Medicare or TRICARE patients, but I do believe that he certainly pleaded that with regard to Stryker. And I think, again, the rule with regard to pleadings is a short and plain statement. It's supposed to be notice pleading with exception of the allegations of fraud. Allegations of original source are not allegations of fraud. We do not have to plead that at the 10-foot level. We can plead those from 5,000 feet, and I think we've done that. And if that's how this court, you know, if the court is true to the standard of review with regard to Rules 8 and 12 and 9b, and particularly with regard to this really unusual statute that has been so badly I mean, every court has had trouble with this original source and public disclosure, and that's why Congress amended it. And that's why you should apply the amended status, because I think it shows Congress's true intent. Thank you, Your Honor. Okay, thank you, Mr. DeWitt. We will take the case under advisement and be back to you in due course. Thank you very much. Ms. Smith, will you call the next case, please? United States, ex-rail James Kraxberger v. Kansas City Power and Light Company. Your Honor, may I wait a moment while my opposing counsel gets ready here? Certainly, certainly. Take your time. Let him get set up.